UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Christopher David Clark

    v.                                                               Civil No. 22-cv-375-LM
                                                                Opinion No. 2023 DNH 055 P

Kilolo Kijakazi, Acting Commissioner,
Social Security Administration

**O R D E R**

Christopher Clark seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the decision of the Acting Commissioner of the Social Security Administration that denied his applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Clark moves to reverse the decision (doc. no. 5) on the grounds that the Administrative Law Judge ("ALJ") erred in evaluating the medical opinions, which resulted in a residual functional capacity assessment that is not supported by substantial evidence. The Acting Commissioner moves to affirm the decision (doc. no. 8). For the reasons that follow, the court grants Clark's motion to reverse and remand and denies the Acting Commissioner's motion to affirm.

**STANDARD OF REVIEW**

In reviewing the final decision of the Commissioner under § 405(g), the court "is limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999); accord Sacilowski v. Saul, 959 F.3d 431, 437 (1st Cir. 2020). The

court defers to the ALJ's factual findings if they are supported by substantial evidence. Biestek v. Berryhill, 139 S. Ct. 1148, 1153 (2019). "Substantial-evidence review is more deferential than it might sound to the lay ear: though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not." Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018) (citation omitted); see also Biestek, 139 S. Ct. at 1154. Rather, the court "must uphold the [Acting] Commissioner's findings if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support her conclusion." Purdy, 887 F.3d at 113 (citation and internal modifications omitted).

## DISABILITY ANALYSIS FRAMEWORK

The Social Security Administration's regulations set out a five-step process that ALJs must follow to evaluate whether a person is "disabled" under the Social Security Act—that is, unable to engage in any "substantial gainful activity." See 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1520.[1] The five steps are as follows:

- **Step One**: If the claimant is presently engaging in substantial gainful activity, he is not disabled. § 404.1520(b).

- **Step Two**: If the claimant does not have any impairment or any combination of impairments that significantly limits his physical or mental ability to do basic work activities, he is not disabled because he lacks a "severe" impairment. § 404.1520(c).

---

[1] Unless otherwise noted, the court will cite the regulations under Title II (disability insurance), 20 C.F.R. pt. 404, which are not materially different from those under Title XVI (supplemental income), 20 C.F.R. pt. 416, in the context of this case. See, e.g., Kimball v. Kijakazi, No. 21-cv-943-LM, 2022 WL 2702819, at *1 n. 1 (D.N.H. July 7, 2022).

- **Step Three**: If any of the claimant's impairments meet or equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled—and the ALJ need not proceed to steps four and five. § 404.1520(d).

- **Step Four**: If the claimant's impairments do not prevent him from doing his past relevant work, then he is not disabled. § 404.1520(e)-(f).

- **Step Five**: If the claimant's impairments do not prevent him from doing other work that exists in the national economy, then he is not disabled. § 404.1520(g).

At steps one through four, the claimant has the burden of proof. Sacilowski, 959 F.3d at 433-34. At step five, however, the Commissioner has the burden of proof. Id.

If the claimant meets his burden at the first two steps of the sequential analysis, but not at the third, the ALJ proceeds to steps four and five, which begin with a determination of the claimant's "residual functional capacity," i.e., a determination of what kind of things the claimant can and cannot do, mentally and physically. See 20 C.F.R. § 404.1545(a)(1). A person's residual functional capacity is an assessment of "the most" the claimant can do despite his limitations. Id. After the ALJ formulates the claimant's residual functional capacity, he compares that assessment against the demands of the claimant's past work (at step four) and against other jobs that exist in the national economy (at step five). § 404.1520(e)-(g). If the claimant's residual functional capacity allows him to perform his past relevant work or work that exists in the national economy, the claimant is not disabled. See § 404.1520(a)(4)(iv)-(v), (e), (f).

## BACKGROUND[2]

Clark filed applications for social security benefits on October 7, 2019, with an onset date of February 1, 2018. He alleged disability due to bipolar 1 disorder, ADHD (attention deficit hyperactivity disorder), cannabis use disorder, and excoriation disorder.[3] His applications were denied initially and on reconsideration. At Clark's request, an ALJ held a hearing on Clark's applications. The ALJ issued an unfavorable decision on February 29, 2021.

I.   Medical History

Clark's medical history begins with an evaluation by a neuropsychologist, Bryan T. Vogel, Psy.D., in July 2015 when Clark was 21 years old. Dr. Vogel diagnosed severe and recurrent major depressive disorder and anxiety disorder. In June 2016, the police were called to Clark's workplace because of Clark's disruptive behavior. Following that incident, Clark was held on an involuntary basis at New Hampshire Hospital in Hampstead, New Hampshire. The court ordered an evaluation for involuntary commitment to New Hampshire Hospital. After the evaluation, Clark was recommended for commitment for one year.

---

[2] The background information is taken from the parties' statements of facts. Doc. nos. 6 & 9; see LR 9.1(c) & (d).

[3] Excoriation disorder is "chronic skin-picking." Everson v. Kijakazi, 2022 WL 3656462, at *3 (E.D. Wis. Aug. 25, 2022); K.C. v. Saul, 2021 WL 411391, at *3 (D. Kan. Feb. 5, 2021).

In February 2018, immediately after the alleged onset date, Clark was transported by ambulance to the emergency department at St. Joseph's Hospital in Nashua, New Hampshire.  Dr. Vatti Deepak noted that Clark had a long history of psychiatric issues, including bipolar disorder and schizophrenia, and had prior psychiatric admissions.  During Dr. Deepak's evaluation, Clark left the building through the ambulance bay doors.  Dr. Deepak notified security but concluded that Clark was not a danger to himself or others.

Clark was hospitalized for a week in March 2018 for a psychiatric inpatient admission after expressing homicidal and suicidal thoughts to his father and having an encounter with the police.  Dr. Alexander de Nesnera examined him and diagnosed bipolar I in a manic episode with psychotic features and cannabis abuse disorder.  At discharge, Clark's father agreed to bring him to follow-up appointments.  Clark was again admitted to New Hampshire Hospital in June 2018 for six days, where he was held in the locked secure psychiatric unit.

During the summer of 2018, Clark's treating physician, Dr. Emad Milad, changed his medications.  Clark also underwent electroconvulsive therapy at Dartmouth Hitchcock Clinic to treat depression.  Nevertheless, Clark was hospitalized for psychiatric issues four additional times between the end of June 2018 and July 2019.

After his last psychiatric hospitalization in July 2019, Clark received mental health treatment through Greater Nashua Mental Health, which included medication and therapy.  He met with a therapist weekly and with a psychiatrist

monthly.  He also met with a case manager and a nutritionist once a week.  With that treatment, Clark improved.   His mental status examinations were mostly normal, and he reported feeling stable. Clark experienced no serious manic episodes that required hospitalization or additional treatment after July 2019.

II.   Daily activities

Except for a brief unsuccessful period on his own, Clark has always lived with his parents.  At the time of the hearing on January 28, 2021, and for some time before that, Clark worked part-time, ranging from 4-5 hours to 15 hours per week, for a wholesale floral distributor where his mother worked.  He cut flowers and helped pack orders.  Clark testified that he was able to do that work because the employer was flexible and accommodated his needs to come in late and leave early when necessary.  He also testified that when he tried to work longer hours he would experience stress that triggered a manic feeling, which caused him to become belligerent and adversarial with his co-workers.

Clark completed high school.  Other than his part time work with his mother at the floral distributor, he has had no significant work experience.  He has a driver's license and is able to drive.  Treatment notes from Greater Nashua Mental Health during 2020 show that at times Clark reported feeling better on the medication regimen, going out to eat with friends, playing video games, taking a trip to North Carolina to hike with friends, and trying some free online courses.  At other times, Clark was depressed and isolated at home.

III.    Medical Opinions

    A.    John J. Warren, Ed.D.

Dr. Warren, a state agency consultant, completed a "Psychiatric Review Technique" form evaluation of Clark's psychiatric impairments on December 18, 2019, for purposes of his application for benefits.[4] Based on his review of the medical record, Dr. Warren found that Clark had medically determinable impairments due to depressive and bipolar disorders and substance addiction disorder. Doc. no. 4-3 at 7. He found that Clark had moderate limitations in sustaining concentration and persistence and moderate limitations in his ability to work with or near others. He also found that Clark could sustain the mental demands of work that involved simple tasks over a workday and work week but that he was moderately limited in his ability to interact with the public, get along with coworkers, and accept criticism from supervisors.

    B.    Philip Robbins, Ph.D.

Clark was referred to state agency consultant psychologist, Dr. Robbins, for an evaluation as part of his application for disability benefits. Dr. Robbins evaluated Clark through telehealth technology on September 16, 2020. He noted that Clark reported that he played video games all day and smoked marijuana except when he worked on Sundays and Mondays. Based on his examination and Clark's records, Dr. Robbins diagnosed bipolar disorder type I, depression, ADHD,

---

[4] The ALJ mistakenly identified Warren as Ph.D. in the decision. Doc. no. 4-2 at 25. Dr. Warren is an Ed.D.

generalized anxiety disorder, social anxiety disorder, excoriation disorder, and cannabis abuse. He found that Clark was functioning fairly well and that he could understand, remember, and apply information; could interact with others; and could concentrate and maintain motivation and focus. Dr. Robbins conditioned those findings, however, on Clark not experiencing a manic episode. He also noted that while Clark was able to work part time, Clark was concerned that additional work time would cause a manic episode.

    C.    <u>Craig E. Stenslie, Ph.D.</u>

For purposes of Clark's request for reconsideration of the denial of his application for benefits, another state agency psychologist, Dr. Stenslie, reviewed Clark's records and completed a "Psychiatric Review Technique" form on September 21, 2020. As part of the record, Dr. Stenslie considered Dr. Robbin's evaluation of Clark that was done on September 16, 2020, and found that Dr. Robbin's opinion was consistent with other medical evidence in the record. Dr. Stenslie also found that Dr. Robbins's opinion confirmed that Clark had improved. Dr. Stenslie found that Clark has medically determinable mental disorders of bipolar disorder, depressive disorder, and "related disorders." Doc. no. 4-3 at 34. He found that Clark had no limitations in understanding and memory, concentration and persistence, and social interactions. He did find that Clark was moderately limited in his ability to respond appropriately to changes in the work setting.

8

D.     John Pelletier, Sc.D.

Dr. Pelletier, a clinical psychologist, completed an "APTD Medical Eligibility Review Summary" form on September 20, 2019, for purposes of Clark's application to the New Hampshire Department of Health and Human Services for the APTD (Aid to the Permanently and Totally Disabled Program).[5] Dr. Pelletier noted that Clark had impairments due to bipolar I disorder, cannabis use disorder, ADHD, and excoriation disorder. He found that Clark had moderate limitations in some aspects of sustaining concentration and persistence, social interaction, and adaptation. He also found that Clark was not capable of basic unskilled work in a competitive labor market, which made him eligible for the ADTP.

E.     Marie Macedonia, Psy.D

Dr. Macedonia, who was one of Clark's providers at the Greater Nashua Mental Health Center, completed a "Mental Impairment – Medical Source Statement" form on October 23, 2020.  She indicated on the form that Clark would be limited at least one third of the time or most of the time in completing daily activities, concentrating, completing tasks, tolerating stress in a work environment, maintaining attendance, accepting instructions and criticism, working with others, adapting appropriately to changes in the work setting, performing at a consistent pace, and adhering to standards of neatness and cleanliness.  Dr. Macedonia wrote that when Clark was not properly medicated he had had episodes of mania that

---

[5] See www.nhcarepath.dhhs.nh.gov/partner-resources/documents/cb-177b.pdf (last visited May 3, 2023).

9

lasted for weeks. She further explained that every manic episode was triggered by work-related stress and that although medication has helped Clark was still struggling. She expected that he would be absent more than four days per month from work.

    F.    <u>Marilou Patalinjug Tyner, M.D.</u>

Dr. Tyner, who is a psychiatrist, also treated Clark at the Greater Nashua Mental Health Center and completed a "Mental Impairment – Medical Source Statement" on November 12, 2020. Dr. Tyner noted diagnoses of bipolar disorder I and ADHD. In the area used for identifying signs and symptoms, Dr. Tyner wrote that the symptoms she checked had been observed "without medication." Doc. no. 4-13 at 1112. For functional limitations, Dr. Tyner found that Clark would be limited at least a third of the time or most of the time in completing daily activities, concentrating, tolerating work stresses, maintaining attendance, accepting instructions and criticism, working with others, adapting appropriately to changes in the work setting, completing a normal work day and week, performing at a consistent pace, and adhering to standards of neatness and cleanliness.

In addition, Dr. Tyner wrote that Clark had had long periods of decomposition in the past and that he would be absent from work about four days per month. Dr. Tyner explained that work stress had caused Clark to experience mania or depression that required periods of inpatient psychiatric treatment. She further wrote that "even with adherence to meds, mood lability manifest. ADHD further compromises ability to sustain work." Doc. no. 4-13 at 1114.

G.     Danielle Zimmerman

Danielle Zimmerman, who was Clark's case manager at the Greater Nashua Mental Health Center, completed a "Mental Impairment – Medical Source Statement" form on January 14, 2021. Before assessing Clark's limitations, Zimmerman explained that Clark becomes fatigued when the stress in his life increases, which requires him to reschedule appointments. She wrote that he needs "significant supports to regulate his symptoms and diagnosis [and] needs frequent reminders to attend weekly appts. and oftentimes still forgets during these periods of stress." Doc. no. 4-27 at 1461. She also wrote that Clark's medication caused him to be lethargic for five days after each monthly injection.

Zimmerman checked the following signs and symptoms: generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, change in personality, and emotional withdrawal or isolation. She found that he would be limited for at least a third of the time in completing daily activities, maintaining social functioning, understanding and remembering, completing tasks, tolerating work stresses, and maintaining attendance. Zimmerman explained that at times Clark was "unable to function during high periods of stress in his life" and that he would "often isolate and disengage with any and all supports until the stressful situations or periods pass." Id. at 1465.

11

IV.    Administrative Proceedings

The ALJ held a telephonic hearing on January 28, 2021. Clark was represented by counsel and testified at the hearing. A vocational expert also testified.

The ALJ posed this hypothetical question to the expert: a person who should avoid social interaction with the general public, avoid tandem tasks and teamwork with coworkers, who requires a low stress job with only one or two step tasks with only minor changes in the routine, and who can only have brief and superficial social interaction with a supervisor. The vocational expert identified several jobs that met that hypothetical. When the ALJ added that the individual would be absent one or more times per month or would come in late or need to leave early weekly, the vocational expert testified that would preclude all jobs. If the person would be off task more than 15% of the day, that too would preclude all jobs.

In the decision denying Clark's application for benefits, the ALJ found that Clark had a residual functional capacity to do all work as long as he avoided social interaction with the general public, avoided tandem tasks and teamwork with coworkers, was limited to brief and superficial social interaction with supervisors, and was limited to working in a low stress environment with only one or two step tasks and with only routine changes in the work routine. Based on that functional capacity and the vocational expert's testimony, the ALJ found that Clark could do jobs as an industrial cleaner, a change house attendant, and a sweeper cleaner. The ALJ concluded that Clark was not disabled. The Appeals Council denied Clark's

request for review on July 21, 2022, making the ALJ's decision the final decision of the Acting Commissioner.

## DISCUSSION

In support of his motion to reverse the Acting Commissioner's decision, Clark contends that the ALJ's residual functional capacity assessment is not supported by substantial evidence. He argues that the ALJ erred by accepting the state agency consultants' opinions and failing to incorporate limitations based on the opinions of his treating sources and the examining state agency physician, Dr. Robbins. The Acting Commissioner moves to affirm, arguing that the ALJ properly assessed the medical opinions and that substantial evidence supports the ALJ's residual functional capacity assessment. For the reasons that follow, the decision is reversed and the case is remanded for further proceedings.

I. <u>Opinions Based on Incomplete Record</u>

Clark contends that the ALJ erred in relying on the opinions provided by state agency consultants Drs. Warren and Stenslie because they were issued before significant additional evidence was available in the record. Specifically, Clark states that Drs. Warren and Stenslie did not review treatment records from the Greater Nashua Mental Health Center in later 2020 and early 2021 and assessments done by Case Manager Zimmerman, treating psychiatrist Dr. Tyner,

13

treating psychologist Dr. Macedonia, and clinical psychologist Dr. Pelletier.[6] The Acting Commissioner contends that the ALJ properly relied on the consultants' opinions to make the residual functional capacity assessment.

An opinion provided by a state agency reviewing consultant cannot provide substantial evidence to support an ALJ's residual functional capacity assessment if the opinion was based on a significantly incomplete record. Kimball, 2022 WL 2702819, at *7 (citing Giandomenico v. U.S. Soc. Sec. Admin., 2017 WL 5484657, at *4 (D.N.H. Nov. 15. 2017)); see also Provencal v. Kijakazi, 2022 DNH 147, 2022 WL 17324286, at *3 (D.N.H. Nov. 29, 2022). "The reviewed record is significantly incomplete if records added or generated after the review 'would materially change the basis for assessing the claimant's limitations.'" Provencal, 2022 WL 17324286, at *3 (quoting Kimball, 2022 WL 2702819, at *9). In other words, review of a partial record cannot provide substantial evidence to support a residual functional capacity assessment "if later evidence supports the claimant's limitations." Randy M. v. Kijakazi, 2021 WL 4551141, at *6 (D.R.I. Oct. 5, 2021).

"[I]t is the ALJ's burden to determine and explain whether missing evidence is material." Motuzas v. Saul, 565 F. Supp. 3d 174, 189 (D.N.H. 2021). The ALJ does not carry that burden by providing only a conclusory statement as to materiality and the content of the new evidence. Id.; see also Gorman v. Saul, 2020 WL 502938, at *3 (D.N.H. Jan. 31, 2020). Instead, the ALJ must explain why new

---

[6] Clark also cites the assessment done in 2015 by Dr. Vogel, but that assessment predates Clark's onset date by several years.

14

records and materials do not show any material change in the claimant's limitations. Motuzas, 565 F. Supp. 3d at 189-90.

In this case, the ALJ acknowledged that Drs. Warren and Stenslie did not review Clark's complete records. The ALJ stated that "they did not consider all of the impairments of the claimant, including ADHD and anxiety."[7] Doc. no. 4-2 at 25. The ALJ then stated that he found "the evidence reflects similar, although not the same, mild to moderate functional limitations, with restriction from interaction with the general public, and reduced interaction with coworkers and supervisors." Id. With that explanation, the ALJ apparently intended to convey that the additional evidence was not material because, based on the ALJ's lay interpretation of the subsequent treatment notes and opinions the additional impairments can be addressed by the cited restrictions.

The ALJ did not identify the other impairments, in addition to ADHD and anxiety, that were diagnosed in the subsequent medical records, nor did he cite any opinion that found only mild to moderate limitations with the addition of the restrictions he articulated. The ALJ also did not explain how he determined that

---

[7] The ALJ is mistaken that Dr. Stenslie did not have an opportunity to assess impairments based on ADHD and anxiety. Dr. Robbins diagnosed both ADHD and anxiety, along with other impairments, in the medical statement that Dr. Stenslie reviewed for purposes of his opinion. Dr. Stenslie quoted Dr. Robbins's diagnosis in his review of Clark's records but did not include all of the impairments in his own diagnosis and did not explain why his diagnosis was different. Dr. Stenslie also did not address Dr. Robbins's comments about the effects a manic episode would have on Clark's ability to function. It appears that Dr. Stenslie may have overlooked the additional impairments that Dr. Robbins found and the additional functional limitations.

those restrictions (restrictions from interaction with the general public and reduced interaction with coworkers) would accommodate Clark's functional impairments due to ADHD and anxiety or any other impairments. The ALJ stated that the more recent treatment notes were consistent with no more than moderate functional limitations and an ability to work in a low stress environment because the treatment notes showed "improvement in symptoms and stability and treatment, and mostly normal mental status exams, with intact memory, judgment and insight." Id.

The cited treatment records, however, document variations in Clark's mental health and functioning during the period with some improvement noted but also increased symptoms of depression, anxiety, and isolation at other appointments. Dr. Macedonia wrote that proper medication had provided some relief for Clark's symptoms, that his decomposition episodes of mania were triggered by work, and that despite proper medication, Clark was still struggling. Importantly, Clark's treating sources, his case manager, his psychiatrist, and his psychologist, all provided opinions that Clark's ability to function was significantly restricted by his impairments, including ADHD and anxiety, and that he would be absent from work a significant amount of time. Drs. Warren and Stenslie did not have the benefit of those opinions.

The ALJ's brief, conclusory, and somewhat inaccurate explanation of the record is not sufficient to carry the ALJ's burden to show that the new parts of the treatment record were not material. Instead, the opinions provided by Clark's

16

treating sources document more limited functional ability and support his limitations.

The ALJ found the treating source opinions unpersuasive for a variety of reasons, including the use of a check-off form. Drs. Warren and Stenslie, however, each used a "Psychiatric Review Technique" form. For purposes of the functional capacity assessment, they provided only two-or-three-word answers, such as "Moderately limited" and "Not significantly limited." The forms used by the treating sources are no more abbreviated and, in contrast, the treating sources wrote narrative explanations in some parts of the form. Therefore, that basis for finding the opinions unpersuasive lacks support in the record.

The ALJ noted that the treating sources did not record side effects caused by Clark's medications. Although not addressed specifically, that reference apparently suggests that Clark was not experiencing fatigue from medication that would cause absences from work. To the extent the ALJ intended to counter the findings about absenteeism in the opinions, that point is made tangentially at best and does not support the finding of no absenteeism.

The ALJ stated that it was unclear whether Dr. Macedonia's opinion was addressing limitations with or without medication, but he did not request clarification. Contrary to the ALJ's assessment, Dr. Macedonia clearly indicated that she answered questions about decomposition in the context of Clark not being medicated and explained the effect medication has had. Therefore, Dr. Macedonia's opinion was not unclear.

17

The ALJ stated as to each opinion that the severity of functional limitations found was not consistent with the treatment records. As is discussed above, the treatment records do not document the consistent improvement and normal results that the ALJ describes. Given the differences in the opinions and the complex record, this case would seem to have been an appropriate opportunity for an independent expert medical opinion. See 20 C.F.R. § 404.1513a(b)(2).

In the absence of an adequate explanation, the ALJ erred in relying on the opinions provided by Drs. Warren and Stenslie that were not based on a complete record.

## II. Residual Functional Capacity Assessment

A claimant's residual functional capacity is the most a clamant can do despite the functional limitations caused by his impairments. 20 C.F.R. § 404.1545(a)(1). Based on his assessment of the record, including the opinion evidence, the ALJ found that Clark could

> perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant should avoid social interaction with the general public; should avoid tandem tasks and team work with coworkers; is limited to brief and superficial social interaction with supervisors; and is limited to working in a low stress environment (defined as performing only simple 1-2 step tasks with only minor changes in work the work routine).

Doc. no. 4-2 at 21. The ALJ used that assessment in questioning the vocational expert about jobs that would be available for Clark to do. When the ALJ added that the claimant would be absent from work more than once per month, would come in

late or leave early once each week, or would be off task more than 15% of the work day, the vocational expert answered that those restrictions would preclude all jobs.

Because Drs. Warren and Stenslie did not review the more recent treatment records and opinions, their opinions cannot provide substantial evidence to support the ALJ's residual functional capacity assessment. Dr. Tyner, Dr. Macedonia, and Case Manager Zimmerman all found that Clark's ability to function was significantly more limited than the ALJ's residual functional capacity assessment. Further, they found that Clark would regularly be absent from work, which would preclude the jobs the vocational expert testified to.

Because substantial evidence is lacking to support the residual functional capacity assessment, the hypothetical question posed to the vocational expert did not accurately reflect Clark's limitations. "For a vocational expert's opinion to constitute substantial evidence, the testimony regarding an individual's ability to perform jobs in the national economy must come in response to a hypothetical question that accurately describes the claimant's impairments." Conrad v. Kijakazi, 21-cv-10788-IT, 2023 WL 2743306, at *13 (D. Mass. Mar. 31, 2023) (citing Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982)). Therefore, substantial evidence is lacking to support the ALJ's finding that Clark was not disabled based on the vocational expert's testimony.

## CONCLUSION

For the foregoing reasons, the claimant's motion to reverse and remand (doc. no. 5) is granted. The Acting Commissioner's motion to affirm (doc. no. 8) is denied.

The Acting Commissioner's decision is reversed and remanded for further administrative proceedings pursuant to Sentence Four of § 405(g). The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Landya B. McCafferty
United States District Judge

May 10, 2023

cc: Counsel of record.